

In The

Court of Appeals

Seventh District of Texas at Amarillo

_____

No. 07-14-00008-CV
_____

W.B.M. MANAGEMENT COMPANY
D/B/A VIVIANS NURSING HOME, APPELLANT

V.

MARY FLORES, APPELLEE

On Appeal from the 108th District Court
Potter County, Texas
Trial Court No. 101179-E, Honorable Douglas Woodburn, Presiding

April 25, 2014

DISSENTING OPINION

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

Respectfully disagreeing with my colleagues concerning the application of the law to the undisputed facts of this case, I dissent. By its opinion, the majority finds the trial court misapplied the law concerning the application of the "objective good faith" standard to the evaluation of an expert report under section 74.351(l) of the Texas Civil Practices and Remedies Code, resulting in a finding of abuse of discretion and the

concomitant judgment to reverse and remand. Because I find the trial court did not act in an arbitrary or unreasonable manner without reference to guiding rules or principles and did not, therefore, misapply the law to the undisputed facts of this case, or otherwise abuse its discretion, I respectfully dissent.

As the majority opinion correctly sets out, this is an interlocutory appeal in a health care liability suit, wherein Appellant, W.B.M. Management Company, d/b/a Vivians Nursing Home, seeks to overturn the decision of the trial court to deny Appellant's motion to dismiss the claims of Appellee, Mary Flores, pursuant to section 74.351(l). TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(l) (West 2012). The majority concludes the trial court erred because the report of Dr. James E. Moulsdale does not constitute an objective good faith effort to describe a causal relationship between Appellant's failure to follow an appropriate standard of medical care and Appellee's claimed damages. Because the majority accurately sets forth the law applicable to a case such as this, I will not restate the principles of law governing an appellate court's analysis of the sufficiency of an expert report as statutorily defined. *Id.* at § 74.351(r)(6).

Reduced to its essence, Appellee claims Appellant's employees failed to provide medical care within an applicable standard of care, and their failure to do so resulted in the death of her mother, Dionisia Dominguez Gomez. In support of her claim, Appellee provided the expert report of Dr. James E. Moulsdale,[1] which opines, in part, as follows:

> In reviewing the nursing home records, I found notes stating that Ms. Gomez's vital signs should be taken only once per week. The nursing home records further indicate that Ms. Gomez's vital signs were, in fact,

---

[1] Dr. Moulsdale is a board-certified urologist who has practiced in the field of urology for over 34 years. Dr. Moulsdale's qualifications as an expert in this field are not challenged.

2

only taken once per week. Had her vital signs been taken more frequently, at a minimum of once per day, it is much more likely that this condition would have been found earlier and might have been treated in the nursing home without the necessity of hospitalization. More likely than not, the vital signs would have shown an increase in body temperature, an increased heart rate, an increased respiratory rate, a decrease in blood pressure, or any combination of the above, indicating a change in the patient's medical condition which required further investigation. Because of the fact that her urinary infection was not discovered in a timely fashion, she required hospitalization and treatment in an intensive care unit. Because this is a life threatening illness, delay in diagnosis is a serious breach of the standard of care.

I believe that this claim does have merit because of the delay in the diagnosis of the urinary tract infection. In my training and experience as a urologist, it is more likely than not that an undiagnosed urinary tract infection might develop into urosepsis, especially in a debilitated patient who is unable to communicate any symptoms or changes in their medical condition. I believe that this was the case in the care rendered to Ms. Gomez. Furthermore, it is documented in the death certificate that the cause of death was sepsis secondary to urinary tract infection.

In the context of a claim based on a failure to timely diagnose Ms. Gomez's medical condition, the report (1) provides a summary of the expert's opinions regarding applicable standards of care, (2) relates the manner in which the care rendered failed to meet those standards, and (3) opines as to the causal connection between that failure and the injury, harm, or damages claimed. As such, the report meets the statutory purpose of an expert report because it (1) informs Appellant of the specific conduct Appellee has called into question and (2) provides a basis for the trial court to conclude the claim has merit. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 879 (Tex. 2001).

Appellant contends, and the majority agrees, the expert report was "impermissibly speculative and conclusory" in its attempt to describe, within the four corners of the report, the "causal relationship between the alleged breach . . . and the

3

death of [Ms. Gomez]." The majority then analyzes relevant case law to reach the conclusion that this particular report does not "link" Dr. Moulsdale's conclusions to the facts of this case.

So, just what are the "facts" of this case? From the four corners of the report, we know that Ms. Gomez was "extremely debilitated," that she was "unable to care for herself," that Appellant was aware of the fact that she had a "probable urinary tract infection," and that in light of that knowledge, Appellant chose to take her vital signs only once per week. We also know the standard of care applicable to this type of patient called for "careful monitoring," which would specifically include taking her vital signs "a minimum of once per day," and that the purpose of that frequency of monitoring was "to detect *any* changes in her condition." We also know this monitoring was "especially" called for in a debilitated patient, like Ms. Gomez, because the patient was not otherwise able to alert the staff on her own. Finally, we know that within reasonable medical probability, "had her vital signs been taken more frequently . . . it was much more likely that [her] condition would have been found earlier" and she might not have required hospitalization. The fact that more careful monitoring would have alerted the medical care providers to provide earlier, more aggressive treatment, establishes a causal relationship between the failure to closely monitor any change in her condition and harm suffered as a result of her declining medical health.

Drawing insight from *Mosely v. Mundine,* 249 S.W.3d 775 (Tex. App.—Dallas 2008, no pet.), the majority opines that the expert report in that case was found to be sufficient because it gave the trial court a "factual basis to understand the change in the patient's condition" – in that case a change from a 1 cm nodule to a 6 cm mass over a

4

21 month period. Here, Dr. Moulsdale's report is really no different in that it places the emphasis on the differential diagnosis of Ms. Gomez's condition *from day to day* (as opposed to from week to week). The majority criticizes Dr. Moulsdale's report for failing to contain a statement concerning Ms. Gomez's vital signs at any specific point in time. In reaching this conclusion the majority completely overlooks the fact that it doesn't matter what her vital signs were at any particular moment because the medical significance is the *change,* not the difference. Dr. Moulsdale's report indicates that it was the daily *change* that would have, in all probability, alerted the Appellants to the imminent need for more aggressive treatment of her failing condition.

In another misinterpretation of Appellee's cause of action and the purpose of an expert report, the majority opines that the "report contains nothing to link [Dr. Moulsdale's opinion that Ms. Gomez's death was 'sepsis secondary to urinary tract infection'] with his conclusion the [Appellant's] failure to check her vital signs daily in the days before her hospitalization led to her septic condition or her death some two weeks later." (Emphasis in the original.) Appellee does not contend that the failure to timely diagnose led to Ms. Gomez's septic condition. Rather, Appellee contends her worsening septic condition (which would have been reflected in her daily vital signs and could have been treated earlier but for the delay in diagnosing Ms. Gomez's infection) led to injury, harm, or other damages because it was not timely diagnosed and treated. Simply put, Dr. Moulsdale's report establishes that Ms. Gomez was harmed by Appellant's breach of the appropriate standard of care.

Contrary to the conclusion reached by the majority, I find the facts of this case clearly provide a basis upon which the trial judge could reasonably have concluded that there was merit to the Appellee's claim. Accordingly, I would affirm the decision of the trial court.

Patrick A. Pirtle
Justice